Good morning, Your Honors. Thank you. Jeffrey Buchholz for Myriad. I'll try to reserve three minutes of my time for rebuttal. Your Honor, Your Honors, Judge Gould, Myriad signed Oracle's source license agreement, which contains an arbitration clause that says all disputes arising out of or relating to, as broad as could be, that agreement have to go to arbitration. And the parties in that agreement adopted the UNCTRL rules, the UN Commission on International Trade Law rules for arbitration, which give the arbitrator the authority to decide arbitrability. That is, whether Oracle's claims fall within the scope of the arbitration agreement or not. Several circuits have held, and we submit that those decisions are correct, that when parties explicitly adopt for international arbitration rules like the UNCTRL rules that give the arbitrator the authority to decide arbitrability, it's because they want the arbitrator to decide arbitrability. And the arbitrator should do so rather than a court. A court, of course, at the end of the day, at the award enforcement stage, can review the arbitrability decision just as it can review any other decision by the arbitrators. But that's what parties intend when they adopt rules like the UNCTRL rules. That's what at least five circuits have held, and we think that Oracle here — I'm sorry, Judge Fletcher. Here's my question. I mean, I read the cases, and I particularly read Judge Lynch's opinion for the Second Circuit with care. What's a little different about this case is that the arbitration clause has jurisdiction coming from two directions. There's jurisdiction over disputes that can be arbitrated, and there's jurisdiction that's saved out for cases that can't be arbitrated. And it seems to me that if you read either one of those two broadly — or maybe I should say, if you read both of them broadly, both of them occupy the entire universe. That is to say, it seems to me a permissible construction of that language that pretty much everything is going to be arbitrable. Or, if you look at the other side, pretty much anything related to intellectual property, that's not arbitrable because that's been saved out. So how do I decide that the arbitrator gets to decide the scope of the arbitration clause when that one is almost infinitely expandable rather than the judge getting to decide what the carve-out is, which in itself is almost infinitely expandable? Your Honor, let me just say first that Oracle drafted this arbitration provision. We didn't. We're the — this one strange thing about this case is — You're just the innocent victims, I know. We're the consumer here. I mean, we're the ones who want arbitration. Oracle, who drafted this arbitration provision, which, as Your Honor said, raises some complications in how it's written, now they don't want arbitration, even though they're the ones who drafted the clause. So anyway, putting that aside. But the question isn't going to whether it's going to be arbitrated, right? The question is who's going to decide. Of course, Your Honors. And I guess the first thing I would say to try to respond to your question, Judge Fletcher, is this case isn't so different as all that. In any case where there's a dispute about who decides arbitrability, the premise is there's a dispute about whether a claim is arbitrable or not, whether it falls within the arbitration clause or not. Now, every arbitration clause can be written differently. It's just a matter of contract. Some are broader. Some are narrower. Some are specific to claims that arise out of a contract. Some are broader like this and cover things that it relate to as well as arise directly out of. Some have a provision that says what happens to things that don't fall within the arbitration clause. Some don't. And then that's dealt with by operation of law, meaning they're not arbitrable. So with respect, I don't think this provision here really is all that different. In all of the cases where courts have held that adopting arbitral rules gives arbitrability to the arbitrators, there's been a dispute over arbitrability. And in some cases it's a dispute. In Schneider, the Second Circuit case, it was whether the investment was an approved investment. The arbitration clause didn't cover unapproved investments. And there was a specific term of art definition to what was an approved investment. Thailand said the investment at issue wasn't approved, and so it wasn't within the arbitration provision and therefore had to go to court. And that dispute over arbitrability, because the parties adopted the uncitralled rules, had to go to the arbitrator. So in this case, the fact that there's two sentences, the arbitration clause and then the carve-out, really doesn't — that doesn't make this any different in principle from any other case, where the arbitration clause says what it says, it covers what it covers, and somebody has to decide whether it covers the claim at issue. The second thing I would say, Judge Fletcher, to respond to that question is, you're right that the arbitration provision here and the carve-out raise some interpretive difficulties. Maybe that's an understatement. But I think one thing that's important for the Court to remember in that regard is, as this Court held in Simula, and as the Supreme Court held in Mitsubishi and many other cases, there's a presumption in favor of arbitrability. Now I'm moving from who decides arbitrability to the substantive question of arbitrability. There's a presumption in favor of arbitrability. So any ambiguity in whether the claims at issue here fall within the arbitration clause or not should be resolved in favor of arbitrability. And as this Court put it in Simula, if the dispute — the arbitration clause in Simula was similarly broad in that it said any dispute not just arises out of, but in connection with, the contract. Here, if anything, the clause is broader because relating to is as broad language as you could find. What this Court had said in Simula was that if the claim at issue so much as touches — that was the Court's word — the contract at issue, then it's arbitrable. But you're now doing exactly what I had such a hard time with, with your opposing counsel's brief, which is conflating the question of who decides arbitrability with the scope of the arbitration clause. It seems to me that that's really important that we keep those two questions separate. Are you now telling me that I should not do that? No, no. I couldn't agree more that this Court should keep those questions separate. I was just trying to answer Judge Fletcher's question about how those two provisions in the contract here interact with each other. Well, it strikes me that they may be very inefficient, but we have a lot of authority that says we enforce parties' contractual agreement to arbitrate, and if the parties have come up with a really inefficient agreement where one form is going to decide arbitrability and that pursuant to the agreement, really the other form should be handling the underlying dispute, well, that seems to fall into the category of tough noogies. That's the parties' agreement, and that's what we would enforce, counsel. But the minute you start conflating the two questions, I lose you. But, Judge Kressen, I apologize. I'm the last person who wants to conflate those two questions. We have not appealed. I would think so. But I was just trying to respond to Judge Fletcher's question. So I'm sorry if I gave the impression that I was appealing on the substantive arbitrability issue. I'm not. It would be a very inefficient agreement, wouldn't it? I'm sorry. It would be a very inefficient agreement. If we read it the way you want us to read it, it would be very inefficient, wouldn't it? Well, I think the agreement – I mean, yes and no, Your Honor. The agreement here is written in a strange way that raises interpretive difficulties for whoever gets to decide how to interpret it. There's no way around that. I don't disagree with that. But I think one thing that's important to remember here is Oracle concedes that one of its claims that it brought in court, it shouldn't have brought in court, it now concedes falls within the arbitration provision. So there's going to be an arbitration, regardless of what this Court says about who decides whether the other claims at issue also are arbitrable. Right. So there may be some inefficiency in the sense that the arbitration provision here is a strange one that's difficult to interpret, but the point of arbitration is – the point of the law of arbitration is to enforce the party's agreements, not to just enforce a sort of preference for efficiency for its own sake. I agree with the last thing you said, but I think we're not communicating about what strikes me as inefficient. I'm not speaking of the difficulty of interpreting the provision, because sometimes provisions are just difficult, and this one does seem to be one of those. I'm speaking of the fact that it may very well be that one form is going to decide the question of arbitrability, and another form, a different form, is going to actually then take jurisdiction over the dispute. That might be the way it works out. That might not be, because the arbitrator may, of course, decide if we're right, that the arbitrator should decide arbitrability. The arbitrator may decide that all the claims at issue are arbitrable, or the arbitrator may decide not. And if the arbitrator decides not, then the claims that the arbitrator decides are not arbitrable go forward in court. Another claim goes forward in arbitration, because Oracle concedes that, and that is what it is. It may be efficient, it may not be, but it's the way that this provision should be interpreted. And I think it's – And I guess it's inefficient in that sense in both directions. That is to say, if a court decides it and says, well, you know, this is all arbitrable, it's a mirror image. Yeah. That's right. So there's some inevitable inefficiency, I suppose, in the who decides arbitrability question when one party tries to litigate about arbitration. I mean, in the last case, Judge Christin, you said it was litigating about litigating. I mean, here it's litigating about arbitrating. And so there's some necessary inefficiency when someone tries to do that. I think the way that we're suggesting the court should resolve it, I think, should minimize that inefficiency, but more importantly, it's really not about maximizing or minimizing efficiency for its own sake. It's about enforcing the party's agreement. And where the parties agreed to the unctual rules, the unctual rules give the arbitrator the authority to decide arbitrability. The only sensible interpretation of that is the parties intended the arbitrator would, in fact, decide arbitrability. If the arbitrator decides arbitrability and gets it wrong, then that's reviewable at the end of the day and at the award enforcement stage. Counsel, Judge Gould, if I could interject a big sort of arbitration issue that maybe isn't precisely raised, but does the record tell us in what percentage of cases where you have arbitrators under UNCTRA, ICC, or the AAA, in what percentage of cases where they review arbitrability, do the arbitrators decide that something is not arbitrable? It's a good question, Judge Gould. I don't think the record contains the answer to it, and I don't personally know a statistic. What I can tell you is I have partners who appear in arbitration proceedings before those bodies, under those rules, all the time, and it's not at all infrequent thing for arbitrators to decide that they don't have jurisdiction over a particular issue. And I guess I would just add that to whatever extent there's any concern lurking behind your question that the arbitrators are somehow more likely to decide in favor of arbitrability or that that's something the Court should be concerned about, I don't think that's true. But in any event, where the parties opt to give the arbitrator the authority to make that decision, then, again, that just is what it is. The other thing I would add to that is I'm not particularly concerned about it, but I was just sort of curious as to how that would work in operation. The other part of my answer to your question, Judge Gould, is here if the arbitrator decides that we're wrong and Oracle's claims at issue are not arbitrable, the arbitrator, under the uncitral rules that we've adopted, can award costs and fees against us. And so there's protection built into the adoption of rules like the uncitral rules where parties want to be – want to have the arbitrator make the arbitrability decision rather than a court that itself restrains parties from making, you know, undisciplined and inappropriate requests for arbitrability determinations made by the arbitrators. Now, so we think here the arbitrators will decide in our favor on arbitrability, but if not, then, you know, that leads to a different course of proceedings. I'm not suggesting that, you know, we should have costs awarded against us if we lose, but the rules provide for that authority, which is another reason why it should be okay from the judiciary's perspective to let arbitrators make these decisions in the first instance, recognizing that parties, you know, adopt in contracts the rules that they choose to adopt. If I may, I'd like to – I'm sorry, Judge Gould. Sotomayor Has the Supreme Court spoken specifically to whether under these rules arbitrators should determine arbitrability? So I understand most – most courts at the circuit level that have looked at it have come to that conclusion, but has the Supreme Court been asked to address that yet? The Supreme Court has not addressed that question, Judge Gould, directly. The Supreme Court set the framework for that question in first options, where it said that the presumption is the court decides arbitrability, the parties can opt out of that presumption, but have to do so clearly. And under that framework now, the majority of the circuits have said that adopting rules like the AAA rules, the ICC rules, or the unconstitutional rules satisfies the first options framework. But the Supreme Court has not specifically decided that question yet, Your Honor. And if you want a Supreme Court case on this point, here's – here's an idea. We'll deny your appeal, and they'll grant cert, and then they'll go with the other circuits. Your Honor, it would be fun to argue it in the Supreme Court, but I really hope that this Court doesn't create a circuit split for its own sake. Pardon me for being facetious. I'd like to reserve the balance of my time, if I may. Thank you, Your Honors. Good morning. Thank you. And may it please the Court. Everybody's right that has been discussing this so far. This is a question of what did the parties agree. It's a matter of agreement. I do disagree with one thing counsel suggested, and it's in the briefs, that somehow there's some Federal policy favoring arbitration as a means of dispute resolution. I think that's confused with what it really is. There's a policy enforcing the arbitral agreement as written, not to push people into arbitration that didn't agree to it. Once you're in arbitration, I concede that there's a Federal policy favoring it. And that's where we are. We are not we are at that threshold point. I want to lead really with the best argument that was made, and the best argument that was made in this case didn't come from me. It came from Judge Armstrong. It came from Judge Armstrong after having spent all the time on the motion to dismiss and then all the time on the injunction motion. Remember, we brought a preliminary injunction motion. And she said the following, and I think it answers the question about the agreement. And that's what we're here about. What did they agree? She said, certainly, had the parties who expressly agreed to keep certain claims exclusively judicial, intended to divest the courts of authority to decide arbitrability, they would have done so explicitly. They wouldn't have done it by reference to rules. That's a powerful statement, and it pretty much incorporates all of the arguments, I think, that I want to make here. And that statement, of course, disagrees with the other circuits that have addressed the question. It does not. It does not, Your Honor, because we are unique. This is a very unique case, and I ought to address what I think are the four distinguishing factors of this case from all the other circuits' cases that they rely on. First of all, we have the carve-out. The carve-out is not. Most of the cases, Republic of Ecuador, the cases they rely on are broad form provisions where everything's arbitrable. But that carve-out goes to the scope of what is to be arbitrated, not who decides arbitrability. That's true. That's true. But once you've carved it out, as the Sixth Circuit said in the Turi case, certainly the parties did not delegate to the arbitrator merely by incorporating rules the power to decide arbitrability of claims that were not within the arbitrator's scope of decision. In other words, it's a complicated point. But in the Turi Sixth Circuit court, they answered this question. They said the threshold decision is always for the court. The court must decide, in the first instance, which claims are arguably arbitrable, and as to them, the court should defer to the court, to the arbitrator, to make the final decision. That's the Turi solution. The Delaware Supreme Court in the Jackson case said whenever you have arbitrable and non-arbitrable claims, merits on the merits, you cannot say that the incorporation of rules clearly and unmistakably delegated the arbitrability question to the arbitrator. Do you have any circuit court that says that? I think the Turi case says that. I think the Turi case says that. They just come to a little different decision on it, a different way to deal with it. So you don't think you're asking us to make a circuit split? No, I absolutely don't think you're going to. I think we are in line with the circuit, the Sixth Circuit at least. The Second Circuit, there are – let me tell you why I don't think Republic of Ecuador, the Second Circuit cases apply here. There are four important distinguishing factors. First of all, the carve-out, very important and a very powerful clause, because it not only carves away some things from arbitration, but it designates an exclusive venue for that to be litigated. That's very powerful, and that's not present in any circuit case, certainly not in the Republic of Ecuador or the follow-on Second Circuit cases. Powerful. It tells you the venue to go to. Why is that powerful? Why is that powerful? They have an agreement, you folks have an agreement that your clients do, that presupposes that some disputes were going to be decided by the court and some disputes were going to be decided in arbitration. So why does the venue help me? We still have to come back to the question is who's going to decide where this one goes? I'll answer that question by addressing the policy and why that clause is in there. The concern of court – look, let's look at the agreement. Oracle, like a lot of IP companies, is prepared to arbitrate its what I'll call garden variety contract disputes, but its crown jewel, intellectual property, it is not prepared to arbitrate. And if you send it to arbitration on those claims, on clauses that are not clear and undistakable, you will frustrate the policy of encouraging arbitration, because people won't arbitrate. Kagan, What's your agreement, and you incorporated these rules? But we accepted out intellectual property claims from the agreement and we accepted claims involving the TCKs. We – Yes. As in terms of arbitrability, but not who decides. That's right. We – that's true. But as a matter of policy, really, if Oracle has clearly expressed an intent, and the parties, really, it applies to both parties, if they have clearly expressed an intent to prevent arbitrators, to not arbitrate these crown jewel issues of IP, does it really make any sense to infer that they intended to have the arbitrability, the critical arbitrability decision, that would shift that to the arbitrator? In this case? Well, several circuits say yes. No. Not in cases where there are both arbitrable and non-arbitrable claims. None of those cases, they all involve broad-form claims. This is a narrow-claw claim. But that does go back to my opening question, that is to say, what's the effect of an explicit carve-out in the arbitration clause? But most arbitration clauses have either explicitly, as here, or implicitly, as in many cases, a carve-out, that is to say, the arbitrator has to decide the scope of what's arbitrable, which means that if there's a decision as to what's arbitrable, that means there may be some things that are not. So the only difference with this case is you've explicitly written in a carve-out to the clause itself, whereas in other cases, well, here's the scope, here's what's arbitrable, but there's an assumption that there's a lot of other stuff that's not covered by it, which is the answer we got. Look, it addresses the point there's no circuit split here. This is a very unique clause. In fact, as everybody seems to acknowledge, it's pretty narrow. I don't think it's illusory. In the case of the Royalty, Judge Armstrong found the contract claims were within the determination of the amount of damages the royalties owed were within the contract provision, but the carve-out is very broad. Why would you infer from a permit? Maybe it's broad and maybe it's not. That's the question. Well, they said it was illusory. They said it was so broad it eclipsed everything. I agree with them. It's pretty broad. Potentially, but that depends on the interpretation. I think they're both potentially occupying the entire universe. But, again, from a vague incorporation of rules, rules that didn't even exist, and I'm going to get to that in a minute. There's a bunch of other issues I want to raise, but from a vague incorporation by reference of rules versus a very specific carve-out of important claims that were not to be arbitrated, you have to make a decision where the burden is on the party to shift it to the arbitrator. A tie goes to the runner, and I'm the runner. So you have to find, by this vague incorporation of reference language, and I'm going to get to that in a minute, that somehow, that clearly, unmistakably gave the power to the arbitrator to decide non-arbitrable arbitrability. You know, as we're looking not just at this case, but as to the future, or I'll say it a different way, as we're looking at the cases already decided with respect to the incorporation of these rules, the so-called, I can't pronounce it very well, UNCTRAL, UNCTRAL, how do I, how am I supposed to say that? UNCTRAL or UNCTRAL? I say UNCTRAL. Unctral, that's fine. I'm thinking back to the great Supreme Court Justice, Bushrod Washington, nephew of George, who was one of the most well-respected judges on that court as he rode circuit in commercial cases, and I read a lot of his opinions. He almost could have been a modern law and economics type talking, and he said with a new clause in the insurance cases that have been coming out, he says, you know, this is a new clause, we've never seen it before. It doesn't really matter how we decide this question, so long as we decide it, it is clear and everyone understands its meaning. So the question is, do we understand at the time of drafting this? Should we have a clear rule that says incorporation by reference of these I think we're getting a consensus among the circuits that if you incorporate UNCTRAL, that means the arbitrator gets to decide it. In a sense, I don't care which way it goes, so long as we have a clear rule that everybody understands. Again, I really have to emphasize the critical distinction here, which does not create a circuit split. In fact, it puts you in line with the Sixth Circuit, is that there is a carve out. Decisions that, you know, that Turing case is different in two respects. Number one, it was not UNCTRAL rules, it was AAA rules. And number two, the amount that what was to be arbitrated was very explicitly stated by the Sixth Circuit as to be extremely narrow. And the combination of having extremely narrow scope of what was to be arbitrated with a reference only to the AAA rules put for the Sixth Circuit a notion that you need a clear statement other than that. And the only other thing I'll say is the Sixth Circuit is reversed as often as we are, but maybe a little more. Robertson Now, moving to the next point, beyond the carve out, Your Honor, because, again, I do think that that is not a circuit split, that you will be in line with the only circuit law. There is no circuit law on this point. Read the arbitration clause itself. Arbitration shall be administered in accordance with the UNCTRAL rules in effect at the time of arbitration, as modified herein. There's no rules. When these parties made the agreement, they didn't specifically reference any particular set of rules. So there's no set of rules in existence at the time this agreement was written that apply to this agreement. It shows two things. It further weakens any inference. Scalia The UNCTRAL was a reference to a fictitious universe? Robertson It says at the time of arbitration. Whatever rules are in effect at the time of arbitration. There was no arbitration when they agreed to the set of rules, and indeed today there remains no arbitration. And the rules can change and did change. Kagan But, counsel, that's a problem for you, isn't it? This is your agreement. Roberts No. I don't think so. I don't think it's a problem in that the only question – if somebody has to say that this agreement clearly and unmistakably transferred and delegated power to the arbitrator to decide arbitrability, it's the burden on that person to look at this agreement and say it does, and it doesn't. It's not – what it says is these rules, we're – we both consent to administer them. Administer to me means how you're going to run the arbitration, not necessarily reflective of whether there's an arbitration or not. But it doesn't say – it says we don't really care what set of rules are in effect. It's really an expression of lack of interest of what the UNCTRAL rules say. We'll be bound by whatever rules govern the arbitration. But can you say that it's a clear and unmistakable delegation of arbitrability to the arbitrator? I don't think you can by that language. Now, the 76 rules at the time, when this arbitration agreement was signed, had a different provision than the 2010 rules, and to this day there's no arbitration commenced. In fact, Your Honor, To say that the 76 and the 2010 language, while slightly different, reads to me very similar in consequence. The 76 rules – I'll tell you how they're different in this case. In the 76 rules, it says the arbitrator has the power to rule on objections, which means To jurisdiction. Which means the party seeking arbitration cannot go to arbitration and ask for a determination of arbitrability. It's limited to the party opposing arbitration to raise objections. That's what they asked Judge Armstrong to do, to stay and allow the – them to go to arbitration. They've never been to arbitration. They wanted to go to arbitrator and ask the arbitrator if the arbitrator had jurisdiction over this dispute, and that they could not do under the 76 rules. The 2010 rules broadened that power. It went from objections to the arbitrator's jurisdiction to rule on the arbitrator's jurisdiction. So if the 2010 rules were applicable, and they weren't even in existence at the time the agreement was made, they potentially could – could support the position that Myriad takes in this case. But given the difference in the rules, and given the fact that there was no rules in effect at the time, and the rules in effect at the time would not support the relief they asked from Judge Armstrong, I don't see how you can get there from here on a clear and unmistakable standard. And again, I think this means that we're not talking about a circuit split. We're talking about a very unique question, a very narrow question, and very specific to this agreement and this situation. Let me go to the third point that I think distinguishes this case. Again, while I've already made it, I said there is no and has been no arbitration pending that would trigger any particular set of rules. Remember, and it's kind of interesting, they claim that this should be arbitrated, but what did they do after we filed our complaint in the district court in California? They filed their complaint in the Delaware court stating their version of the case. If they were so hot and believed that this was all arbitrable, didn't they have Why the question I would ask is why didn't they file an arbitration at that moment? I think by filing their claims in the Delaware court, they waived it. But I don't have to get there. They filed their suit under a different contract. That's true. That's true. And they're going to say that that contract is part of the dispute. I don't know if they will or not, but the point is, if they had an arbitration – if they believed our claims were arbitrable, why would they have filed – why would they have not responded to our complaint with an arbitration, at least, and they let it sit, 7 months, 8 months, and then just before the judge ruled, they filed an arbitration demand. But it was our claims that are arbitrable, not theirs. What claims did they have to arbitrate? The claims that they had to litigate, they filed in the Delaware court. If they had claims to arbitrate, they should have filed them. The point on that is there really is no arbitration pending. And under the 76 rules, which is what they argued to this Court apply, page 33 of their brief below, the arbitrator can't do what they want it to do. The only power the arbitrator was given was to rule on objections, not to determine arbitrability at the request of the claimant. Okay. You've used up your time, so if you want to sum up. Right. I do want to say that I do think that the Ture case is really the place to go with this thing. I think Ture addressed the very same problem. You have both arbitrable and non-arbitrable claims, and how are you going to handle it? Are you really going to say that a party who files in court and believes those claims are non-arbitrable, which the district court agreed with, has to run to an arbitrator to get a determination of that merely because the other party objects? That's not efficient, and that's not right. And Ture says, as a practical matter, that can't be the result. You can't just say that it's arbitrable just because some of the claims are arbitrable, therefore, the arbitrability question is arbitrable. So you have to figure out a way to deal with that, and the way that you can do that is to follow a regime similar to what Ture did, or the Delaware Supreme Court, where it just said everything has to go to the arbitrator on arbitrability. Thank you. Thank you. Mr. Barnes. Thank you, Your Honors. Very briefly, we just heard three supposed distinctions that make this case unique from all the other cases and that would prevent this Court from having to create a circuit split. The first one was that there's a carve-out here. But, Judge Kristin, you asked opposing counsel twice. The carve-out isn't about who decides arbitrability. It's about substantive arbitrability, and twice he agreed. So that distinction is no distinction at all. The second distinction was that because of the way the contract that Oracle wrote is worded, there weren't actually any rules that existed at the time, and so Oracle wrote this illusory contract, and now, ha-ha, we find out that there actually weren't any rules in existence. That wasn't in their briefs, and so I'm trying to understand that on my feet here today, but to the extent that I understand it, it seems like it's a little hard to swallow. The un-satural rules existed at the time of this contract, the 1976 version. Rules like the un-satural rules periodically get updated over time, and so I think it would have been in everyone's contemplation that there was a possibility there could be a new version of the un-satural rules at some point. So it makes perfect sense for the contract to say the rules that are in effect at the time of an arbitration are the rules that govern that arbitration. That's just the same kind of procedural presumption that applies in court. But I don't know how that means that this case is distinguishable from all the other cases where parties adopt rules like the un-satural rules. And the third distinction is a waiver argument that also isn't in Oracle's brief, and so is not properly before you. The only thing I would say about waiver is that under the Supreme Court's decision in Howsam, waiver is presumptively for the arbitrator. Unlike arbitrability, which is presumptively for the court, but the parties can opt out of that default rule the way that the parties here did. As to waiver, the presumption is that it's for the arbitrator. So that's not a distinction that helps Oracle in any way. Finally, Judge Fletcher, I think that you made a very good point about the value of clarity and predictability here. And whatever the rule is, so long as parties know when they contract what the rule is, that has independent value. Anytime the question is whether to create a circuit split, it always makes sense to hesitate and think whether that really makes sense, whether to disagree with all the views expressed by all the other circuits. But particularly where there really is independent value in clarity and predictability, as there is here, there's just no good reason to do that. Finally, Turey. Okay. You're a minute over, too, so. I apologize, Your Honor. Thank you very much. I appreciate your time. Thank you very much, Your Honor. Thank both sides for your good arguments. The Oracle America v. Marriott Group now submitted for decision. And that finishes our arguments for the day. Thank you.
judges: Fletcher, Gould, Christen